(C.D. 4754)

CREATIVE PLAYTHINGS, DIVISION OF COLUMBIA BROADCASTING SYSTEM, INC. *v.* UNITED STATES

Court Nos. 73-1-00182, etc.

(Decided June 29, 1978)

*Barnes, Richardson & Colburn* (*Rufus E. Jarman, Jr., Edward F. Christopher* and *Michael A. Johnson* of counsel) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*Alan L. Langus* and *Madeline B. Cohen*, trial attorneys), for the defendant.

MALETZ, Judge: The three civil actions consolidated for trial involve the issue as to the proper tariff classification of merchandise invoiced as cloth blocks and cloth bricks which was exported from the United Kingdom and Holland and entered at the port of New York during the period from September 1971 through June 1973. The merchandise consists of 4-inch foam rubber, cloth-covered cubes packaged in sets of nine. The cubes display colorful graphic representations of animals, fruit, toys, etc., on four sides and solid colors on the two remaining sides. Each cube is composed of polyurethane foam with cotton covering sewn over it.

The importations were classified by the government under item 737.90 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68-9, as toys not specially provided for, and assessed duty at the rates of 21% ad valorem for the 1971 entries and 17.5% ad valorem for the 1972 and 1973 entries. Plaintiff claims that the importations are properly classifiable under item 737.55, TSUS, as modified by T.D. 68-9, which covers toy alphabet blocks; and toy building blocks, bricks, and shapes, and which carries duty rates of 12.5% ad valorem for the 1971 entries and 10.5% ad valorem for the 1972 and 1973 entries.

The relevant statutory provisions are contained in Schedule 7, Part 5, Subpart E, TSUS, and read as follows:

Classified under:

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 737.90 | Other | 21% ad val. [1971] 17.5% ad val. [1972–73] |

194

Claimed Under

737.55    Toy alphabet blocks; and toy building
              blocks, bricks, and shapes_____  12.5% ad val.
                                                                          [1971]
                                                                          10.5% ad val.
                                                                          [1972–73]

The record in this case consists of the testimony of three witnesses and eight exhibits for the plaintiff and three witnesses and six exhibits for the defendant.[1] The record in *1–2 Kangaroo, Inc.* v. *United States*, 66 Cust. Ct. 474, C.D. 4236 (1971), together with the exhibits therein, was incorporated into the record of the present case.

## I

Considering first the record, it shows that the imported cubes are designed and merchandised for children between the ages of 1½ and 3 years who use the cubes for stacking and piling, among other things. On the other hand, children under the age of one tend to use the cubes as something cuddly. By contrast, older children of four, five and six years are not interested in the cubes since they are capable of constructing more complicated structures and therefore prefer blocks of varied shapes and sizes which are made of more solid materials such as wood.

Whether the stacking of the cubes by children in the 1½ to 3 year age group constitutes building is a matter on which the experts do not agree. Thus, Dr. Sigel, plaintiff's expert, and all other witnesses with the exception of Dr. Loomonitz, defendant's expert, agreed that stacking is building. Dr. Loomonitz disagreed, being of the opinion that stacking is the precursor of building. Further, all the witnesses agreed that children perform stacking and related simpler activities before they try more complex structures. Additionally, both plaintiff's and defendant's expert witnesses agreed that graphic representa-

---

[1] The witnesses for plaintiff were: (1) Lester Olinsky, director of product engineering for Creative Play things, who has seen the subject merchandise being used by children several times; (2) Dr. Irving E. Sigel, a psychologist employed by the Educational Testing Service in Princeton, New Jersey, who has a doctorate from the University of Chicago, whose background and research deal with cognitive development and social behavior of young children, and who has seen the subject merchandise used by children; and (3) Mrs. Virginia D. Hoyt who has sold and advertised the product from her children's clothing and toy store in Brooklyn, New York, and has seen children use it in her store.

The witnesses for the defendant were: (1) Dr. Clara Loomonitz, director of the Early Childhood Center at Brooklyn College, and an associate professor in early childhood education since 1958, who holds a doctorate in psychology and early childhood education from Yeshiva University and has observed children playing with building toys but has never personally observed children playing with the subject merchandise; (2) William Heck, a manufacturers' representative for three wooden toy manufacturers, who has sold various types of building blocks and may have seen the subject merchandise once in a house; and (3) Stephen Miller, New York, New York, who has been the manager-director of Novo Educational and Equipment Corporation since August 1974, and prior thereto had been employed as the president of plaintiff, Creative Playthings, and also held positions as director of product selection, director of product development, and senior vice president of Creative Play-things. Mr. Miller developed the subject merchandise in that he incorporated the idea of adding graphic representations to the sides of the cubes.

tions on blocks, including alphabet letters, are frequently ignored by young children when such blocks are used for stacking or building.

With regard to the design of the importations, the evidence shows that the prototype of the cubes was originally manufactured by Creative Playthings in the United States in sets containing four 4-inch cubes and two rectangular pillars (4″ x 4″ x 8″). The prototype cubes had a foam rubber interior and were covered by a cotton fabric without graphic representations and were designed so as to be useful for building by a child and at the same time to be protective to the child. The following qualities were important in the design of the original cubes: the "forgiving" quality of the foam and cotton covering; the ease of washing and cleaning; the lack of a tendency to stick or slip, as opposed to vinyl or some wooden surfaces; the large size to permit ease of manipulation by small children; and the use of uniform cubes to give impetus to early building activities.

The design of the set was changed in 1969 while Mr. Miller was director of product development at Creative Playthings. Pursuant to Mr. Miller's decision, graphic representations of animals, fruit, toys, etc., were added to four sides of each cube in 1969–70. These graphic representations were an adaptation of cubes designed in the United Kingdom by another company which used graphics as a puzzle feature, that is, when the cubes were assembled in a certain manner a picture was formed. The puzzle feature was eliminated in Creative Playthings' adaptation and replaced with the above-mentioned graphic representations.

The witnesses differed as to whether this new design permitted the product to be recognized as building blocks. On this score, plaintiff's witnesses testified that the design of the imported sets was particularly wellsuited for building by 1½ to 3 year olds for the following reasons: (1) the stability, size and softness of the material enable children of that age range to manipulate the cubes, and the softness eliminates the danger of getting hurt; (2) the lack of variation in shape suits the building requirements of this age group who are just beginning to build; (3) the graphic representations on the cubes do not detract from building but are either ignored or used in a kind of fantasy play which the child sometimes incorporates into the structure; and (4) nine cubes are an appropriate number for building by this age group.

In contradistinction, defendant's expert, Dr. Loomonitz, testified that for a toy to be considered building blocks it must have (1) stability; (2) a variation in shapes with a mathematical relationship of sizes so that the shapes can fit together;[2] (3) simplicity of design; and

---

[2] Regarding the need for variation in shapes, it is interesting to note that Dr. Loomonitz was of the opinion that a set consisting of *one* shape (such as the Playplax cylinders which were held by the court to be building blocks or shapes in *1–2 Kangaroo, Inc.* v. *United States, supra,* 66 Cust. Ct. 474) are *not* building blocks or construction sets even though they were specially designed to fit together.

(4) a sufficient quantity of blocks so that a variety of structures may be built. According to defendant's witnesses, the imported cloth cubes are not suitable for building since they (1) are unstable (i.e., made of lightweight, crushable material which easily falls over); (2) are the wrong size and shape in that they are too large and uniform in size, whereas building blocks must have variations in shape and must, therefore, come in a variety of shapes, such as oblongs, cubes, squares, pillars, triangles, etc.; (3) are designed with graphic representations which may sometimes distract the child from building and which detract from the simplicity of design of traditional building blocks; and (4) are not sufficient in number since the nine cubes cannot offer the variety of experience essential to building or construction.

With regard to the susceptibility of the imported merchandise for building, Dr. Sigel testified that the cloth cubes have the physical characteristics of a block and as such have certain seductive qualities which almost compel stacking and building in the hands of young children; Mr. Olinsky stated that the effect of the graphic representations on the cubes made the product more saleable to the adult purchaser and had little effect on the child; Mr. Heck testified that two year olds could build under a parent's direction; and Dr. Loomonitz acknowledged that it was reasonably probable that a child might start stacking these blocks after experiencing them for a time. It is to be added that defendant's witnesses who testified that the characteristics of the merchandise would detract from its building use did not deny the merchandise could be stacked or applied to some form of building. Indeed, Dr. Loomonitz agreed that the imported cubes were susceptible to some type of building.

Parental or adult acceptance of the merchandise was also a determining factor in the design. Thus, the witnesses agreed that parents and adults accept the merchandise or similar products as building toys.

The record further shows that the toy industry represented the merchandise as building toys for the young child or toddler. This is indicated by plaintiff's catalogues which picture a child stacking the cloth cubes in a building configuration. It is further indicated by the facts that Mrs. Hoyt sold and advertised the merchandise to parents and adults as building blocks and that on her own initiative she used a picture of the imported cubes in an advertisement designed for her store which read "Build a Better Childhood," thus emphasizing the use of the merchandise for building. In addition, defendant's witness from the trade (Mr. Heck) indicated that the trade denominates as building blocks toys for 1½ year old children who, in his opinion, would generally be capable only of stacking.

Finally, a demonstration in the form of a film showing a three year old girl playing with a set of the imported cloth cubes was presented at the trial. The presentation consisted of two reels of film shot in succession with the camera stopped only to change the reels. The record shows that the situation was not rehearsed and that no instructions were given to the child as to how to play with the cubes. During the filming the child repeatedly looked over at the camera in the direction of her mother who encouraged her with such comments as "very nice, honey"; "that's pretty"; and "what is it?" The child had her own set of cloth cubes and had played with the cubes before. During the break for the change of reels, the child's own set of cubes was added to the set she had been playing with and thus in the second half of the film the child played with the two sets. The three year old played with the cubes for the entire duration of the film which ran approximately 10 minutes. Throughout the film, the child was busily engaged in stacking the cubes in towers, sometimes five high; in aligning the cubes to make walls; and in building a semicircle around herself. Also, throughout the film the child ignored the graphic representations on the cubes.

## II

Since it is not disputed that the imported cloth cubes are toys within the meaning of Schedule 7, Part 5, Subpart E, the question before the court is whether the imported cloth cubes are classifiable under item 737.55, TSUS, as toy building blocks, as claimed by plaintiff. For the reasons that follow, we find the importations are so classifiable.

At the outset, all the witnesses agreed that the imported cubes are capable of being, and in fact were designed to be, stacked or aligned. Only witnesses Olinsky, Sigel, Hoyt and Miller have seen the product in actual play conditions, and they all agreed that one of the activities engaged in by the young children for whom the cubes were designed and are marketed is such stacking activity.

Against this background, much of the record consists of attempts to determine whether such activities fall within expert and trade understanding of "building" so as to make the subject articles the particular type of toys covered by item 737.55, TSUS. As to this, as previously stated, Dr. Sigel, plaintiff's expert witness, and all other witnesses with the exception of Dr. Loomonitz, defendant's expert witness, agreed that stacking is building. Further, all the witnesses agreed that stacking is a natural stage in the progress of children toward complex building, which may involve making large structures, or a

careful calculation of proportion in the building items. The progression was described by Dr. Sigel as follows (R. 108):

* * * [W]ith certain kinds of rather small cubes, some children around the first year of life can stack small cubes. One or two, sometimes three. As children get older, the pattern seems to go from a kind of a banging and exploring behavior with them to gradually stacking to eventually building more complex structures. This is a whole transition going from age one to four or five and up. Children play with more complicated blocks from four, five, six and so on and even older, sometimes.

Dr. Loomonitz agreed (R. 174) with a statement to similar effect in chapter 2 of Harriet M. Johnson's *The Block Book*, p. 10, (defendant's exhibit B)—which defendant introduced in evidence as an authoritative publication:

The first use of blocks among small children is not properly building. Blocks are carried from place to place, or they may be stacked or massed in irregular, conglomerate piles before the period of construction begins. * * * *Between two and three years of age, real construction begins* and has been found to follow broadly three or four lines of development * * *. [Emphasis added.]

An illustration from *The Block Book* (p. 11) indicates that one such development was the construction of a tower of four or five blocks. Further illustrations from *The Block Book* (p. 13) indicate that other such developments are two patterns—a tower and row—which "are *preeminently characteristic of youthful building.*" [Emphasis added.] These are precisely the types of activities which all witnesses agreed children perform with the imported cubes and which are shown in the film and in all relevant catalogues.

In a related vein, defendant's witness Heck testified in part as follows:

Q. So why would they call them building blocks if they sell them to children one and a half years old?—A. Because a manufacturer gets as wide a spread on age groups as he can get. I know there are some children probably who can interpret blocks with the help of their parents. [R. 221]

*        *        *        *        *        *        *

Q. * * * A child of two is capable, in your opinion, of stacking only, or can they do some building?—A. I think a child of two can do some building * * * I think a child of two is a more mature child and can receive a little more instruction from his parents who I presume he would receive the blocks from and the direction from the parent. * * * [R. 223–24]

What is more, the record as a whole demonstrates that structures erected by children of the age range for which the imported merchandise is designed are in many cases abstract or representational and are thus not recognizable by adults as real structures. But this is

not relevant. For the fact that such structures are abstract or representational does not mean that the blocks used in their construction preclude them from classification as building blocks. *1–2 Kangaroo, Inc.* v. *United States, supra,* 66 Cust. Ct. at 480.

From the foregoing, it is concluded that for the purposes of the tariff schedules the stacking of blocks by young children with the intent to construct a structure, whether real, abstract or representational, constitutes "building" within the meaning of that term in item 737.55.

It seems clear that the merchandise in question is not used exclusively for the purpose of erecting structures such as towers, walls, bridges, etc. On the contrary, it is a fact of childhood life that many products, while designed with a certain purpose in mind, may be used by children at play in a variety of ways. The record indicates that plaintiff has produced a product which, while leading the very young child toward building, also has subsidiary uses such as chewing, throwing, and sorting. Indeed, according to testimony in this very case, traditional building blocks can also be used, and in fact are used, by children for other nonconstructive purposes. Here the imported cubes were designed so as to permit the young child to engage in subsidiary pursuits without hurting himself.

The record further shows that children in the age range for which the imported merchandise is designed generally tend to ignore specific instructional qualities of the graphics on so-called alphabet blocks, which they are not old enough to comprehend, and fasten upon their building or decorative aspects, quite apart from their purported educational content. Thus Dr. Loomonitz testified (R. 158):

> You know, our children really don't use them much and never have as alphabet things. They have stacked them, lined them up and sometimes looked at a few and sometimes they have used them to decorate their block buildings.

Similarly, here, the record makes clear that children in the 1½ to 3 year age group generally tend to ignore the graphic representations on the cubes and instead stack and align them.

In sum, as previously stated, the record shows that the imported cubes are designed for children between the ages of 1½ and 3 years and that these children use the cubes primarily for stacking and piling. This is emphasized by the fact that the cubic shape of the articles suggests, both to adults and to children, that they can be stacked or aligned to create simple structures. Thus Dr. Sigel testified (R. 117–18):

> As I said earlier, partly the physical characteristics suggest that the nature of the block as a block has a certain seductive quality to young children. It attracts a child to do something. There is something about the object that has its own attractiveness, lends

itself to piling—stacking is a very common behavior observed with children about this age. These objects lend themselves to that function. They almost ask for it. If you lay out a group of objects like this which are cubes or rectangles with flat surfaces, the probability is very high those children will engage in stacking behavior. We don't know why but they do. These objects share those characteristics and that would [be] one reason. Secondly, it would be their quality. They are soft. I think that would suggest it is made for younger children because older children would expect a more solid form like wood. I would have expected more complex variations among them to allow for more complex structures, different sizes, weights, different height. Different shapes which would be characteristic of what you would use for children sort of in the late preschool period like four. * * *

The merchandise was recognized by Mrs. Hoyt, a parent and retailer who had dealt in the merchandise, as a building shape, which appealed to young children largely because of its simplicity, Mrs. Hoyt testified (R. 205–06):

Q. You say you sell this item as a building toy in the store. Tell us what you mean by that.—A. We sell it to an age range of children who are beginning to experiment with shapes other than Teddy bears and soft, cuddly, lovable things. It is our feeling that they are moving out into a world that has other things in it other than Mommy and themselves. And, the simplest form there is, is a cube. It's even on all sides. It just sits there and, in our estimation, the very beginning of building plus having some of the recognizable forms that a little child would go for. It's a transitional bridge for a child. They start off with ideas that will grow into something else. But, it's in the beginning stages. These are in our building department, if you would, because they are the first step a child should make.

In short, the imported merchandise is perceived as a building toy for the very young—an introduction to the concept of shapes. It is an introductory item which a child will outgrow as more sophisticated ideas suggest themselves during development. It may then be replaced by a more traditional building set.

As previously indicated, the record further shows that the toy industry represented the merchandise as building toys for the young child or toddler. This is indicated by plaintiff's catalogues which picture a child stacking the cloth cubes in a building configuration. Also, defendant's witness from the trade, Mr. Heck, indicated that the trade denominates as building blocks toys for 1½ year old children who, in his opinion, would generally be capable only of stacking. Thus Mr. Heck testified (R. 253):

Q. In your opinion, Plaintiff's Exhibit 1 is a stacking block, is that correct?—A. To me it is a soft stacking block.

Q. It is a stacking block, is that correct?—A. Yes, sir.

Previously, Mr. Heck testified (R. 223):

Q. So therefore, if I understand your testimony, stacking, as far as the industry is concerned, is building.—A. I suppose if you are just looking at it from the industry's point of view, yes. But, I am just giving you my opinion.

With regard to retailing, Mrs. Hoyt (as already noted) sold and advertised the merchandise to parents and adults as building blocks; further, on her own initiative, she used a picture of the imported cubes in an advertisement designed for her store which read "Build a Better Childhood," thus emphasizing the use of the merchandise for building.

Additionally, examination of the sample alone, particularly in toy cases, is potent evidence of the chief use of an article. E.g., *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, 40, C.D. 3061 (1967); Sturm, *A Manual of Customs Law* (1974) pp. 226, 394. Examination of the sample here without more indicates that the block-like shape of the cubes with its flat plane on six sides has the characteristic of impelling young children to stack or build. This same conclusion is expressed in the following testimony of Dr. Sigel (R. 117):

> * * * [T]he physical characteristics suggest that the nature of the block as a block has a certain seductive quality to young children. It attracts the child to do something. There is something about the object that has its own attractiveness, lends itself to piling—stacking is a very common kind of behavior observed with children about this age. These objects lend themselves to that function. They almost ask for it. If you lay out a group of objects like this which are cubes or rectangles with flat surfaces, the probability is very high those children will engage in stacking behavior. We don't know why but they do. * * *

Defendant, however, relies upon *Louis Marx & Co., Inc., et al.* v. *United States*, 40 Cust. Ct. 434, Abs. 61534 (1958). In *Marx* the merchandise involved alphabet blocks consisting of 1¼-inch wooden cubes with letters of the alphabet on four sides and outlines and names of animals on the two remaining sides. The testimony indicated that the blocks were educational in that they enabled a child to learn the alphabet. The court found that the alphabet blocks were not toy "building blocks" within the meaning of paragraph 1513 of the Tariff Act of 1930, as amended, on the following basis (p. 436):

> * * * The toy blocks in question * * * are merely small cubes, designed for handling by younger children who could grasp, stack, and knock them down for their amusement. With the use of these blocks, a child might learn the alphabet or possibly get an idea about certain animals. They are totally unlike the building or construction blocks * * * which, by their various shapes and sizes and somewhat peculiar construction, show that they are intended for the amusement of older children capable of putting a collection of the blocks together to create or build some particular object.

Defendant argues that the cloth cubes here involved are extremely similar to the wooden cubes in *Marx* in that they are used by young children merely to grasp, stack, knock down and toss, and are not specifically designed to build structures and objects. In the present case, however, the evidence is quite different. For here, the evidence establishes that the chief use of the importations is for stacking or building by children in the 1½ to 3 year age group. It is true that young children will chew, throw and sort the present cubes, just as they do with other forms of blocks, but such use, as the record demonstrates, is a subsidiary use and not their chief use.

It is also to be noted that *Marx* arose under pre-TSUS law. The claimed provision was paragraph 1513, as amended, providing for toy "building blocks." Obviously, that provision was far more restrictive than the provision involved here, item 737.55, which covers "toy alphabet blocks; and toy building blocks, bricks, and shapes."

In drafting the present item 737.55, Congress clearly intended to prevent classification difficulties with regard to the very question which is presented by this case, by including alphabet blocks—which had been denied classification as building blocks under paragraph 1513 of the Tariff Act of 1930—in item 737.55. In this way, Congress overruled the holding and rationale of the *Marx* case.

The *Tariff Classification Study*, Schedule 7, p. 294 (1960), explains the change as follows:

> Item 737.55 provides for toy alphabet blocks and for toy building blocks, bricks, and shapes, at the rate of 21 percent ad valorem. The existing tariff has, as a result of a trade-agreement concession, a separate rate provision for building blocks or bricks valued at 8 cents or more per pound which are now dutiable at the rate of 21 percent ad valorem. So-called "alphabet blocks", however, are dutiable in the "basket" toy provision at the rate of 35 percent ad valorem, as are building blocks valued at less than 8 cents per pound. *Because there is frequently no significant difference between some toy "alphabet" blocks and toy "building" blocks,* and because there exists some doubt about the tariff classification of construction units in shapes other than "blocks" or "bricks" which frequently are imported with toy building blocks, *item 737.55 was created to cover all of these articles at a single rate of duty.* Imports of alphabet blocks and the low-priced building blocks on which the duty is being changed are believed to be small, and the change in duty is not expected to affect the volume of imports. [Emphasis added.]

It is thus clear that, aware of the distinctions which the *Marx* case had introduced into the classification of toys which might be used for stacking or building purposes by young children, Congress intentionally altered the tariff schedules so as to include in item 737.55 those toys which demonstrated the very stacking, piling, and aligning

features described by the court in the *Marx* case. The phrase "alphabet blocks" was not named by the pre-TSUS statute; it was added by TSUS not to create distinctions, but to eliminate the distinction resulting from *Marx*.

Another case relied upon by the defendant is *Bruce Duncan Co., Inc., et al.* v. *United States*, 47 Cust. Ct. 358, Abs. 66198 (1961), *aff'd on rehearing*, 53 Cust. Ct. 184, C.D. 2493 (1964), *aff'd*, 53 CCPA 90, C.A.D. 882 (1966), which is completely distinguishable from the present controversy. That case decided under paragraph 1513 of the Tariff Act of 1930 involved snap tracks which were conceived, manufactured and commercially sold as parts of train sets. The court held the imported snap tracks were not building blocks on the basis that by their "design and construction, the articles in question are snap tracks fitted for, and dedicated to, use with snap trains." (47 Cust. Ct. at 360.) In the present case, the merchandise is not dedicated to uses other than building. On the contrary, plaintiff's merchandise is dedicated principally to the construction of rudimentary structures. A child's fantasy may allow him to do other things with the merchandise, and it is designed so as not to injure him if he does, but it is in no way dedicated thereby to uses which would remove it from the claimed classification.

Finally, defendant points out that in *1–2 Kangaroo, Inc.* v. *United States, supra*, 66 Cust. Ct. 474, the record showed that the slotted feature of the Playplax units rendered them "capable of being combined in any number of simple or complicated forms or construction, not merely stacks as in the case of alphabet blocks." *Id.* at 480. The slotted feature allowed individual units to be combined in stable fashion. This feature would seem to be too complex for the young children who use the instant cloth cubes. However, within the limitations imposed by the youth of the user, the cloth cubes are suitable for stacking or building by the age group for which they were designed; i.e., children 1½ to 3 years old.

For the foregoing reasons, the court holds that the imported cubes are classifiable under item 737.55 as toy building blocks. Judgment will be entered accordingly.